UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SEAN I. MONROE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-929** |
| **N. BURL CAIN, WARDEN** | **SECTION C (3)** |

### ORDER AND REASONS

Before the Court are the objections of petitioner, Sean Monroe, to the magistrate judge's report and recommendation that his petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 be dismissed with prejudice. Rec. Doc. 15. Petitioner objects to the magistrate judge's recommendations regarding his first, second, third, fifth and sixth claims. Rec. Doc. 16. In addition, on May 14, 2007, while the report and recommendation was pending in Section "K,"[1] petitioner filed a motion for stay and abeyance of his petition. Rec. Doc. 17.

In his motion for stay and abeyance, the petitioner stated that he had recently discovered evidence in the District Attorney's file that he alleged was withheld from the defense that was both material and exculpatory, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and

---

[1] The magistrate judge issued her report and recommendations on October 17, 2006, while the case was assigned to Section K. On July 23, 2007, the case was transferred to Section H. On August 30, 2007, the case was transferred to this section.

claimed that the evidence elucidated "good cause" for his failure to exhaust his claims in state courts, due to "Lawless State Actions and Impediments." However, the petitioner did not attach any particular evidence that was previously withheld, make any arguments why such evidence was exculpatory and material, or state how such evidence related, if at all, to his existing claims. The Court therefore ordered that the petitioner submit a memorandum, and attach any pertinent evidence, responsive to the above issues.[2]  Rec. Doc. 20.  The petitioner has now responded as requested by the Court. Rec. Doc. 21.

The Court has reviewed the petitioner's response and his objections to the report and recommendation, the report and recommendation, petition, record, and the applicable law. The Court adopts the report of the magistrate judge as it relates to the factual and procedural background, and the discussions of timeliness, exhaustion, and procedural default, Parts I through VI.C. In addition, the Court adopts the report and its analysis as it relates to petitioner's second claim (Part IX) as its opinion. However, the Court finds that certain portions of the petition require further discussion, including his third claim (of actual innocence) and of the procedural default of petitioner's fifth and sixth federal claims. Furthermore, the petitioner correctly objects that the magistrate judge has applied the incorrect analysis to his first claim, which the Court will address. The Court will also address the question raised by petitioner's motion for stay and abeyance and in his recent response to the Court's order. Ultimately, after reviewing petitioner's objections and the objected-to portions of the report and recommendation

---

[2] The Court also attached a copy of the United States Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269 (2005), which sets forth the standard governing the granting of a stay by a district court of a "mixed" § 2254 habeas petition containing both exhausted and unexhausted claims.

*de novo*, the Court adopts the magistrate judge's recommendation as to each of the claims in the petition.  The Court also finds that the claim raised in his motion for stay and abeyance is without merit, and that the motion for stay and abeyance should be denied for the reasons discussed below.  Therefore, the Court finds that the petition should be dismissed with prejudice.

## Claim of Actual Innocence (Petitioner's Third Federal Claim)

In his third federal claim, petitioner claims he has new, material, non-cumulative and conclusive evidence that proves he is actually innocent of the crime of which he was convicted. Rec. Doc. 12.  In essence, the petitioner argues that the state, at trial, gave the inappropriate time of the crime, which undermined his alibi defense, and that his cell phone records prove that he could not have been at the location of the crime when it occurred.[3]  He argues that the crime actually occurred at around 10 a.m. on December 8, 1998, in Harahan, LA, as evidenced by the testimony of the victims of the crime, and the first responding police officer.  He argues that his cell phone records indicate a call to his cell phone in New Orleans East at 9:55 a.m, making it "virtually impossible" for him to have been the perpetrator of the crime, five minutes later and many miles away.  However, at trial the state, in its arguments and through the elicited testimony of Detective Almerico, placed the crime at approximately 11:00 a.m. on December 8, 1998, and petitioner's alibi defense was formulated around this theory of the crime.  Petitioner's girlfriend did testify at trial about the 9:55 a.m. call, which came to her while she was with Monroe, State

---

[3] This argument is also at the heart of his fourth and fifth claims, of ineffective assistance of counsel for failure to fully investigate the state's case and phone records and to object to prejudicial remarks, and of cumulation of error due to prosecutorial misconduct, including the prosecution's knowing presentation of false evidence/testimony.  Rec. Docs. 1-2 at 19, 1-3 at 1- 5.  The full factual and logical basis for this claim is clearer in his application for post-conviction relief in the state trial court.  State Rec. Vol 2, pp 4-9.

Rec. Vol. 4, Trial Tr. Vol. II at 122-23, but in the context of presenting the phone records to show why Monroe did not respond to a phone call from the police later in the day (petitioner claimed the phone had run out of minutes). It seems that petitioner claims that this phone call proves he could not have committed the crime, and (in his unexhausted fourth claim of ineffectiveness of counsel, which petitioner has voluntarily withdrawn[4]) that his counsel should have realized its significance, through earlier investigation, of the time of the 9:55 call, and perhaps highlighted this significance to the jury in its argument.

     As noted by the magistrate judge in the report and recommendation, this claim was not exhausted in the state courts as required prior to bringing this federal petition. Rec. Doc. 15 at 11. Ordinarily, a federal court should dismiss a § 2254 habeas petition that contains both exhausted and unexhausted claims, that is a "mixed petition." *See Rose v. Lundy*, 455 U.S. 509 (1982); *Rhines v. Weber*, 544 U.S. 269 (2005). However, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) allows a federal court, in its discretion, to deny habeas relief on the merits of a claim, regardless of whether the applicant has exhausted state remedies. *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998); 28 U.S.C. § 2254(b)(2). The magistrate judge found it appropriate to dismiss this claim after addressing it on its merits, and this Court agrees. As noted by the magistrate judge, "an actual innocence claim predicated on newly discovered evidence, like that presented by Monroe, has 'never been held to state a ground for federal relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.' *Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000)(*quoting Herrara v. Collins*, 506 U.S 390,

---

[4] *See* Report and Recommendation, Rec. Doc. 15 at 12; Rec. Doc. 14.

400 (1993))." Rec. Doc. 15 at 28. The Court engages in the discussion below because it perceives a tenuous connection between this claim and the issue raised in petitioner's motion for stay and abeyance, discussed below.[5]

The petitioner makes significantly more of the discrepancies in the testimony regarding the time of the robbery than the record reflects. The testimony of the victims petitioner points to that purportedly places the actual time of the robbery at 10:00 a.m. suggests their general lack of confidence as to the time. For example, Shakyra Murphy, one of the two victims of the robbery, testified that the time the robbery began "was around 9:50, 9:40, 10:00 o'clock, somewhere around there." State Rec. Vol. 4, Trial Tr. Vol. I at 61. At a bench conference on an objection, soon thereafter, defense counsel noted that Murphy had "already given a different time [in her testimony] than what she gave the police." *Id.* at 65. Defense counsel then questioned Murphy about the discrepancy: "Okay, and if he's [reponding-officer Graham] written in his report that you told him that it occurred between 10:00 and 10:30 --". *Id.* at 66. Counsel further questioned Murphy about her prior statement, to which she responded, "I remember, it was like I said, it had to be around that because I had one customer that morning, which was like 9:40. So, it had to be between that time." *Id.* at 68.[6] On cross-examination, defense counsel asked the other victim,

---

[5] The Court also notes that it has a different understanding of the factual basis for petitioner's claim than did the magistrate judge, who stated that petitioner "alleges that the evidence at trial, combined with new evidence of his telephone records and his alibi witness, show that he could not have committed the crime at 11:00 a.m., as suggested by the State at trial." Rec. Doc. 15 at 28. It appears that petitioner is instead arguing that he could not have committed the crime at 10:00 a.m., the time at which he claims the evidence presented at trial shows the robbery was actually committed, but that the state, before and during trial, improperly placed the time of the crime at 11:00 a.m.

[6] Murphy later further clarified her testimony, on redirect by the state: "Q: This robbery had happened around 10:00 in the morning? A: Like I said, I had one customer that morning and we open for 9:30. So in between doing the customer and him leaving, it was around maybe 10:00 or 10:30, cause when we got back next door [from where they called the police], it was right at 11:00 o'clock or something around that." *Id.* at 96.

5

Andrea Duhe, "Now, you stated that the robbery occurred sometime around 10:30, in your initial report to the police you stated that the robbery occurred sometime around 10:00, 10:30?" Duhe responded, "Ten something, to be exact, I don't know." State Rec. Vol. 4, Trial. Tr. Vol. II at 73. Later on, Duhe testified to a general lack of a precise recollection of the time.[7] Petitioner also points to Officer Graham's testimony as placing the robbery at 10:00 a.m. However, Graham does not clearly state that he recalled the robbery itself to have occurred at 10:00 a.m.[8] Other, more definitive testimony placed the time of the robbery closer to the end of the hour.[9] Furthermore, the jury was presented with all the evidence, including testimony regarding the 9:55 a.m. phone call, at trial. Indeed, the record reflects that defense counsel was fully aware of the discrepancies, and made an attempt to highlight them. It appears it became clear, when the witnesses were questioned about the discrepancies in their recollections, that the perceived inconsistencies were not dramatic in reality; the actual testimony presented does not reflect the clear distinction between the testimony putting the robbery closer to 10:00 a.m. and that placing

---

[7] Defense Counsel: "If the police officers's report said that they arrived at 11:00 o'clock, would you dispute, it says 10:51 at the time of the occurrence, it also says that Officer Almerico arrived at 11:06 and there was somebody there before that, right? A: I don't know what time it was." State Rec. Vol. 4, Trial Tr. Vol. II at 82. At another bench conference soon thereafter, defense counsel further indicated he was trying to highlight the inconsistency in the victim's various recollections of the time. *Id.* at 94-95.

[8] On direct examination by the state: "Q: Turning your attention to December 8, 1998 at approximately 10:00 o'clock in the morning, what, if anything, happened that day? A: I was on patrol and I received a call over JPSO headquarters, they dispatched me to an armed robbery that occurred at 6626 Jefferson Highway." State Rec. Vol. 4, Trial Tr. Vol I at 112.

[9] "The call [from dispatcher regarding a robbery in progress] came out approximately, maybe ten minutes before eleven, 10:50-ish." Testimony of Detective Almerico, State Rec. Vol. 4, Trial Tr. Vol. II at 10. Almerico later indicated that this call came at "10:52, to be exact." *Id.* at 33. Witness Sharon Prestenback testified that she saw a suspicious-acting car, that matched the description of petitioner's car, in the parking lot outside the location of the robbery at "almost 11:00." State Rec. Vol. 4, Trial Tr. Vol. I at 109.

it nearer to 11:00 a.m. that petitioner suggests.

The evidence of the phone call itself is not "new;" as indicated above, petitioner's girlfriend testified regarding this call. The jury heard all the evidence, including any arguable inconsistencies, at trial. Factual determinations of the jury are afforded great weight under the AEDPA standard of review.[10] This Court sees only minor inconsistencies in the witness' recollection of the timing of the crime, and can find nothing even questionable in the jury's determination, let alone an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as would be required for this Court to grant relief under AEDPA. Therefore, this claim is be dismissed.

## **Procedural Default of Fifth and Sixth Claim**

The Court finds no error in the magistrate judge's legal analysis regarding these claims or the recommendation that they should be dismissed as procedurally barred. The Court only notes these claims to address a point in petitioner's objection to the report and recommendation. In discussing the standard for dismissal of a federal habeas claim on the basis of procedural default (and more specifically, the petitioner's burden if he attempts to escape the bar by establishing

---

[10]

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2).

that a fundamental miscarriage of justice would occur if the merits of his claim are not reviewed), the magistrate judge stated that petitioner does "not actually claim he is not guilty." Rec. Doc. 15 at 19. However, as petitioner points out in his motion for stay and abeyance, he did claim actual innocence of the crime in his petition, in his third claim (discussed above). He also states that "he is not an attorney and by raising the actual innocence, [he] avers that this [that it, that he is not guilty] is exactly what he was trying to say." Rec. Doc. 17 at 2-3.[11] However, the Court agrees with the magistrate judge, as indicated in its discussion of petitioner's actual innocence claim, above, that petitioner has not provided evidence that would support a "colorable showing of factual innocence." See Rec. Doc. 15 at 18. The magistrate judge correctly determined that these claims should be dismissed as procedurally defaulted and barred from federal review.

### Claim of Improper Denial of the Motion to Suppress (Petitioner's First Federal Claim)

In his petition, Monroe claims that the trial court erred in denying a motion to suppress a statement he made to Harahan police officer Joe Almerico after he was appointed counsel, and that the state appellate court erred in finding the denial of the motion to be harmless error. *See* Rec. Doc. 1 at 13 to 15 of 21. The Court of Appeal of Louisiana, Fifth Circuit, in its review of this claim on direct appeal, described the circumstances that lead to this claim as follows:

---

[11] Petitioner also correctly notes the rule that the pleadings of *pro se* litigants, such as petitioner, are to be liberally construed. *Id.* at 3 n..1.

> Defendant gave his first statement on December 10, 1998. Detective Almerico testified that he read defendant his constitutional rights before that statement was taken by Sergeant Kevin Hollingsworth. Defendant indicated that he understood those rights, and he did not ask for an attorney. In his initial statement, Monroe told the investigating officers that he had not allowed anyone else to use his car at any time on the day in question. That statement is not at issue here. Almerico testified that after the initial statement was taken, defendant's girlfriend, Temika, called Almerico a few times and told him that defendant wanted to speak to him about the case. Therefore, while Almerico was at the Jefferson Parish Correctional Center on another case, he went upstairs and took a second statement from the defendant on December 21, 1998. Sergeant Fanguy was also present. Almerico did not remember whether he read defendant his rights again before he interviewed him. Defendant told him that they had the wrong guy and that he wanted to get out of jail. Defendant insinuated he knew who committed the robbery. He told Almerico that he lied about the vehicle and said that somebody did use his car on the day of the robbery. Defendant stated that Temika had lied to protect him. He told Almerico that rather than asking defendant whether he committed the armed robbery, Almerico should have asked whether defendant knew who committed the armed robbery. Defendant said that he could tell Almerico who did it, but first he wanted to get out of jail. Almerico advised him that the DA's office and the judge would have to intervene, and when he had the evidence to produce, Almerico would contact the DA's office or the judge and they could work out something to get him out of jail on bond.

*State v. Monroe*, 00-1354 (La.App. 5 Cir. 3/28/01), 784 So.2d 29, 36-7.  The court concluded that Monroe's right to counsel had attached prior to the taking of this statement (the record indicates that Monroe was appointed counsel at the initial court appearance on December 17, 1998), and that because the interrogation was a "critical stage" of the proceeding, he was entitled to have had his counsel present.  *Id.* at 37.   The court also noted that the relevant Louisiana jurisprudence requires that before an inculpatory statement, made during a custodial

9

interrogation, may be introduced into evidence, the state must prove beyond a reasonable doubt that the defendant was first advised of his *Miranda* rights and that the statement was made freely and voluntarily, and not under the influence of fear, intimidation, menaces, threats, inducement or promises. *Id.* at 37-8. The court determined, that because it did not appear that the officer promised Monroe anything, or coerce him in any manner before he gave this statement, that the statement was made voluntarily. *Id.* at 38. However, because the record did not show that the defendant was advised of his rights before he gave this statement, the court could not state that Monroe made a knowing and intelligent waiver of his right to counsel. *Id.* As a result, the court concluded that the statement should have been suppressed and not presented at trial. *Id.*

However, the court then determined that the erroneous admission of a confession or statement was a trial error which is subject to harmless error analysis. *Id.* In this case, the court acknowledged that the admission of the statement, although he did not admit to committing the robbery, may have hurt his defense because he stated that his girlfriend, Temika Parker, had lied to protect him, and because she was used as an alibi witness at his trial. However, the court also reasoned that she had damaged her credibility by her own internally inconsistent testimony at trial. The court concluded, in light of the significant other evidence presented at trial, that the error was harmless. *Id.* at 39.

In the report and recommendation, the magistrate judge concluded that this claim was not cognizable on federal habeas review, citing *Stone v. Powell*, 238 U.S. 465 (1976). In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief

on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494.  The magistrate judge recommended dismissal of this claim because petitioner did not contend that he was denied a full and fair hearing on the motion to suppress his statement.  However, petitioner correctly argues in his objection that his claim is of violations of his Fifth and Sixth Amendment rights to remain silent and to counsel, and that *Stone* does not apply in this case.  In *Withrow v, Williams*, 507 U.S. 680 (1993), the Court declined to extend the *Stone* restriction on the exercise of federal habeas jurisdiction in Fourth Amendment cases to a state prisoner's claim that his conviction rested on statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Withrow*, 507 U.S. at 683.  The Court reasoned that it had made clear in *Stone* that the limitation was based on prudential concerns counseling against the application of the Fourth Amendment exclusionary rule on collateral review, concerns that did not apply in the context of a violation of an individuals personal constitutional trial rights.  *Id.* at 686-95.  The Court also noted that it has repeatedly declined to extend the rule in *Stone* beyond its original bounds.  *Id.* at 686.  Accordingly, petitioner's claim that the trial court erred in denying his motion to suppress his second statement is a cognizable claim that this Court will review.

       This Court has no trouble concluding, in agreement with the Louisiana Fifth Circuit,[12]

---

[12] The Louisiana Supreme Court denied Monroe's writ application for review of the Louisiana Fifth Circuit's decision affirming Monroe's conviction, without reasons.  *State v. Monroe*, 2001-1280 (La. 5/8/02), 815 So.2d 828. (Three justices of the court would have granted the writ.)  When the last state court judgment does not indicate the basis for its decision, this Court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  Thus this Court assumes that the Louisiana Supreme Court reached the same conclusion as did the Louisiana Fifth Circuit regarding the second statement: that is was error to admit it at trial, but that the error was harmless.

that the admission of Monroe's second statement at trial was error.  The statement was made to Detective Almerico after petitioner's Sixth Amendment right to counsel had attached, and Almerico's questioning of Monroe, which was far more active than merely listening to petitioner (that is, he "deliberately elicited information" from petitioner, *see Massiah v. United States*, 377 U.S. 201, 206 (1964)),  represented a "critical stage" of the prosecution to which the right clearly applied.  *See, e.g. Michigan v. Jackson*, 475 U.S. 625 (1986).  Without a showing that Monroe was again given a *Miranda* warning, the state can not show that he knowingly and intelligently waived his right to have an attorney present.[13]  *See Patterson v. Illinois*, 487 U.S. 285, 296 (1988); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The question presented to this Court, then, is whether this error was harmless.  *Milton v. Wainwright*, 407 U.S. 371, 372 (1972).  More precisely, on federal habeas review, the Court must determine whether the constitutional error had a "substantial and injurious effect or influence on the jury's verdict."  *Brecht v. Anderson*, 507 U.S. 619, 623 (1993).[14]  This standard is "more forgiving" to the state criminal process than that elucidated in *Chapman*.  *Fry*, 127 S.Ct at 2325.   *Chapman* holds that on direct review of an error in a state criminal proceeding by a higher state court, the prosecution must prove that the error was harmless beyond a reasonable doubt. 386 U.S. at 24.  The Supreme Court refined the *Brecht* standard in *O'Neal v. McAninch*,

---

[13] In the absence of such warnings, petitioner's Fifth Amendment rights are also implicated by this custodial interrogation.

[14] The Supreme Court recently clarified, in the context of significant confusion among the federal courts of appeals, that this harmlessness standard, and not a standard based on the combination of that set forth in *Chapman v. California*, 386 U.S. 18 (1967) and in 28 U.S.C. § 2254(d)(1), still applies to federal collateral review of constitutional errors in state courts, post-AEDPA.  *Fry v. Pliler*,  -- U.S. --, 127 S.Ct. 2321, 2325 (2007); *see Burbank v. Cain*, 2007 WL 2809996 (E.D. La., 9/24/2007) (Berrigan, J.).

513 U.S. 432 (1995), holding that where a federal habeas court reviewing a state court error for harmlessness is in "grave doubt"about whether or not such error had a substantial and injurious effect or influence on the jury's verdict, the petitioner must win. *Id*. at 436; *see also Tucker v. Johnson*, 242 F.3d 617, 629 (5th Cir. 2001), *quoting Woods v. Johnson*, 75 F.3d 1017 (5th Cir. 1996).

There are several ways in which the admission of petitioner's second statement could have impacted the jury's deliberations. First, while it was not precisely a confession (Monroe clearly asserts that he did not commit the robbery), the statement was inculpatory in that petitioner insinuated he had knowledge of the crime, and that his car had been involved. He also stated that Parker, his girlfriend, had previously lied to protect him, which likely undermined her credibility when she testified as to his alibi at trial. After Detective Almerico testified about the statement, the prosecution referred again to the statement in its closing argument, pointing out that Monroe had told him that both he and Parker had originally lied to the police. State Rec. Vol. 5, Trial Tr. Vol. III at 19-20.

However, Monroe's second statement was not a confession; indeed, he stated that he was not involved and that the police had the "wrong guy." Although he stated that Parker had lied to protect him, she significantly damaged her own credibility through her own testimony, which was internally inconsistent. As noted by the Louisiana Fifth Circuit on direct appeal, "while she claimed to have been uncertain of the time throughout the morning in question, and contradicted herself repeatedly, she was nevertheless certain that the activities had taken place during the period in which the crime was committed." *Monroe*, 784 So.2d at 38. Though the prosecution

13

did reference Monroe's second statement in its closing, the weight put on it was relatively minor; while the prosecution spent approximately half a page of the trial transcript discussing the statement, it spent six full pages of its closing argument going through Parker's testimony at trial, piece by piece, highlighting the numerous inconsistencies. State Rec. Vol. 5, Trial Tr. Vol. III at 19-20, 67-73. Finally, and most importantly, there was significant other evidence of Monroe's guilt presented at trial. As summarized by the Louisiana Fifth Circuit:

> Andrea Duhe positively identified defendant as the individual who robbed her. Duhe had seen the defendant when he came into Easy Money the day before the robbery to fill out a loan application. Shakyra Murphy, defendant's friend, told the police officers that the individual who robbed her looked like the defendant from the neck down. Detective Joe Almerico testified that he received a call about 10:50 a.m. regarding a robbery in progress at the Easy Money store. He learned that a maroon two-door Beretta was used in the robbery. A search showed the defendant owned a maroon two-door Beretta. Sharon Prestenbach, delivery driver for Sclafani's, identified a photograph of defendant's vehicle as the vehicle she saw next to Easy Money at about 10:50 a.m.

*Monroe*, 784 So.2d at 38. This Court would only add that Duhe was quite confident in her identification. *See* State Rec. Vol. 4, Trial Tr. Vol. II at 100-101. Although the defense attempted to call into question her identification because of the general unreliability of eyewitness testimony, those general concerns are not implicated here. Unlike a case of an eyewitness identification of a stranger, Duhe had met Monroe the day before at the store when he came in to fill out a loan application, and had seen him talking to his friend, Shakyra Murhpy, for "hours." *Id.* at 90. For these reasons, the Court can not conclude that the error in admitting Monroe's second statement to the police had a substantial and injurious effect or influence on the

jury's verdict. Although the Court is troubled by the error, and the issue is close, those troubles to not rise to the level of "grave doubt." *See O'Neal*, 513 U.S. at 436. Therefore, this claim is denied.

## Motion for Stay and Abeyance

On May 14, 2007, while the report and recommendation was pending in Section K, the petitioner filed a motion for stay and abeyance, claiming that he had filed a public records request for his district attorney's file, and that he had discovered evidence that was withheld from the defense. He did not attach or describe this evidence, but claimed that it was both exculpatory and material, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In a subsequent order, the Court requested that he respond to several questions about the nature of his claim, and attach any such "newly discovered withheld exculpatory and impeaching evidence." Rec. Doc. 20 at 2, quoting Rec. Doc. 17 at 3.

The petitioner responded and provided the Court with a copy of the evidence he alleges was withheld from the defense. Rec. Doc. 21-2 at 4 of 5. The evidence is a police report of a voluntary sworn statement of a witness who did not testify at trial, Cindy Bodker, taken on December 10, 1998, two days after the robbery. In her written statement, Ms. Bodker states as she was walking to her car at about 10:50 a.m. on December 8, 1998 that she saw a maroon Beretta with two black occupants in it driving toward 6626 Jefferson Highway, where the robbery occurred, and "slightly or partially pull into the parking lot..." The car contained a black bug bridal over the front grill. After she pulled out of the driveway of the house she was

working at, she then saw the same car with the same two people in it drive past her. She was asked about how much time had elapsed from the time she saw the car the first time and the second time, and responded "I am not positive, about a minute, not really sure."

The Court also requested that the petitioner indicate how his claim of a *Brady* violation relates to his other claims, or whether it is a new, independent (and therefore unexhausted) claim. Rec. Doc. 20. It appears that the petitioner's claim relates to his third federal claim of actual innocence, discussed above, and as such may also be an attempt to escape the procedural default of his fifth and sixth claims. Each of these claims was also unexhausted in the state courts, and thus would ordinarily require this Court to dismiss his petition as a "mixed petition." *Rose*, 455 U.S. 509 (1982); *Rhines*, 544 U.S. 269 (2005). Petitioner has thus requested this court stay his claims in order to allow him to return to state courts and exhaust these claims. Rec. Doc. 21. (Because of the AEDPA one-year statute of limitations, discussed by the magistrate judge in the report, and the fact that this statute of limitations is not tolled during the pendency of a federal petition, *see Duncan v. Walker*, 533 U.S. 167, 181-182 (2001), if the Court simply dismissed the petition as "mixed," he would be unable to refile in federal court after exhausting his unexhausted claims). The Supreme Court has addressed the standard governing the granting of a stay in such a situation.

> [I]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than

> dismiss, the mixed petition. In such a case, the petitioner's interest
> in obtaining federal review of his claims outweighs the competing
> interest in finality and speedy resolution of federal petitions.

*Rhines*, 544 U.S. at 278 (internal citation omitted).[15]

Rather than determining whether a stay is appropriate, such that petitioner could proceed with his unexhausted claims in state court, the Court will exercise its discretion to consider and deny the claim on its merits.[16] *Jones*, 163 F.3d 285, 299 (5th Cir. 1998). In *Brady v. Maryland*, the United States Supreme Court held that due process requires that a prosecutor must disclose upon request evidence favorable to the accused when such evidence is material to guilt or punishment. 373 U.S. 83, 87 (1963). The Court further held that evidence is "material" if there is a reasonable probability that disclosure would have changed the outcome of the proceeding, that is, a probability sufficient, in light of all the evidence, to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). To establish that the state has breached this duty, a defendant must show that (1) the state withheld evidence, (2) the evidence is favorable to the accused, and (3) the evidence is material to guilt or punishment. *DiLosa v. Cain*, 279 F.3d 259, 262-63 (5th Cir. 2002).

Here, it is not even clear that petitioner can even establish the first prong of this test, that the state withheld the evidence. Beyond a suggestion that he himself has not ever seen the report

---

[15] The Supreme Court's concern about dilatory litigation tactics stemmed from the potential of capital petitioners, in particular, attempting to avoid execution of the sentence of death, *id.* at 277-78, a concern which is not presented by a petitioner, such as here, attempting to obtain relief from a sentence of life imprisonment.

[16] Ultimately, this has the same effect as a determination that petitioner's claim is not potentially meritorious, and thus does not justify a stay.

of Ms. Bodker's statement, petitioner does not show that his counsel never saw it.  Petitioner found it pursuant to a public records request of the district attorney's file of the case, and the petitioner in his own application for post-conviction relief indicates that the state provided his counsel with open-file discovery, which "included statements of the victims, witnesses and police reports."  Application for post-conviction relief, State Rec. Vol. 2 at 10.  Without further inquiry on this issue, the Court can not definitively resolve this question.

However, such inquiry is unnecessary, as the "discovered" evidence does not satisfy the second and third prongs of the *Brady* test.  Petitioner argues that the evidence is favorable to him because it contradicts the testimony of Sharon Prestenback,[17] because Ms. Bodker's testimony demonstrates that the "maroon Beretta <u>was not</u> in the Easy Money parking lot long enough for the alleged crime described by the victims to have been committed."  Rec. Doc. 21 at 12 (emphasis in original).  The discrepancy is again less significant than the petitioner argues: Bodker was unclear about the precise length of time between when she first saw the car and when she saw it again.  She also does not purport to know where the car came from or where it went before and after the brief window of time she states she saw it.  Thus her statement in no way indicates that the Beretta she saw could not have been involved in the robbery.  Furthermore, Bodker's statement appears to corroborate the state's case in ways that would have been quite damaging to the defense.  Prestenback could not recall whether the car she saw had

---

[17] Presenback, a delivery driver for a restaurant next door to the pay-day loan store where the robbery occurred, testified that as she was leaving to make a delivery at approximately 10:50 a.m. on the morning of the robbery, she saw a maroon Beretta with two people inside it in the alley behind the building.  She thought that the vehicle was a little suspicious, because it was moving slowly.  When she returned from her delivery five to ten minutes later, the car was gone.  State Rec. Vol. 4, Trial Tr. Vol I at 100-06.

anything on it; Bodker indicated that the car she witnessed had a black bug bridal on the front of it, as did the petitioner's car.  In closing, defense counsel attempted to highlight the fact that Prestenback had not noticed whether or not there was anything on the car.  State Rec.Vol. 5, Trial Tr. Vol. III at 38.  Furthermore, defense counsel attempted to suggest that perhaps Prestenback recalled the car from seeing it the day before, when Monroe had come to the Easy Money store to obtain a loan, rather than the day of the robbery.  *Id.* at 39.  Bodker's statement actually confirms that a car matching the appearance of petitioner's car was seen at the scene of the robbery at or near the time the robbery occurred.   Therefore, this Court can not conclude that the evidence, even if it had been withheld from petitioner, was favorable to him.  Nor can it conclude, in light of all the evidence, that there is a reasonable probability that the statement's disclosure would have changed the outcome of the proceeding, either as to guilt or punishment.  That is, petitioner has not shown that it was "material."  Accordingly, this Court finds that this claim is without merit, and should be dismissed.

## **Conclusion**

The Court adopts the report and recommendation on all other issues, and agrees with the magistrate judge's conclusion that the petition should be dismissed.

Accordingly,

IT IS ORDERED that the motion for stay and abeyance of petitioner Sean Monroe be hereby DENIED.  Rec. Doc. 17.

IT IS FURTHER ORDERED that the petition of Sean Monroe, be hereby DENIED WITH PREJUDICE. Judgment will be entered accordingly.

New Orleans, Louisiana, this 20th day of March, 2008.

                     _____
                     HELEN G. BERRIGAN
                     UNITED STATES DISTRICT JUDGE